THE HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MARLENE ELLIOTT, a single individual,

Plaintiff,

v.

UNITED PARCEL SERVICE, INC., a
foreign corporation,

Defendant.

No. C07-05453 RBL

DECLARATION OF LAURA M. SOLIS IN
SUPPORT OF DEFENDANT UNITED
PARCEL SERVICE, INC.'S MOTION TO
DISMISS PLAINTIFF'S CLAIMS WITH
PREJUDICE

I, LAURA M. SOLIS, declare and state as follows:

1.      I am one of the attorneys at Perkins Coie, LL representing United Parcel Service,

Inc. ("UPS") in this case, and make this declaration based on my personal knowledge of the facts

set forth herein.

2.      While plaintiff Marlene Elliott ("plaintiff") was still represented by counsel, UPS

and plaintiff exchanged initial disclosures and written discovery requests pursuant to the Court's

discovery orders.  UPS complied with all of plaintiff's discovery requests in a timely manner and

produced all relevant documents, except as protected by the attorney-client privilege and/or the

work product doctrine, or filed appropriate objections to plaintiff's discovery requests.

Plaintiff's answers and responses to UPS's discovery requests, however, were incomplete even

when she was represented by counsel.

DEFENDANT UNITED PARCEL SERVICE,
INC.'S MOTION TO DISMISS (NO. C07-05453
RBL) – 1
00895-1076/LEGAL15103677.1

**Perkins Coie** LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

3.     The parties conducted mediation on April 18, 2008 pursuant to CR 39.1(c)(3) and the Court's scheduling order.  The parties continued to engage in settlement discussions after mediation until plaintiff's attorneys abruptly moved to withdraw from the case on May 28, 2008.

4.     On October 2, 2007, the arbitration entitled In the Matter of the Arbitration between United Parcel Service and Marlene Elliott, Teamsters Local Union #174, FCMS No. 070604-57258-8 was held before Arbitrator David Gaba on plaintiff's grievance challenging her discharge.  True and correct copies of excerpts of the Transcript of Proceedings from the arbitration are attached hereto as Exhibit A.

5.     I received a copy of plaintiff's medical records from plaintiff's treating physician, Dr. Craig Arntz, in response to a records request.  A true and correct copy of the February 21, 2007 chart note I received from Dr. Arntz's office is attached hereto as Exhibit B.

6.     On September 12, 2008, UPS filed a motion to compel plaintiff's complete answers and responses to UPS discovery requests.  UPS filed the motion after plaintiff had repeatedly refused to communicate with UPS concerning her failure to cooperate in discovery.  These facts are more fully set forth in my declaration in support of UPS's Motion to Compel and the supporting exhibits thereto.  I will summarize plaintiff's non-response for the Court's convenience here.  On June 29, 2008, I sent a letter to plaintiff requesting complete responses to UPS's written discovery requests.  Plaintiff did not respond to this letter.  On August 22, 2008, I sent a second letter to plaintiff requesting that plaintiff provide the overdue discovery immediately.  Although plaintiff received the letter on September 2, 2008, she did not respond.  On August 28, 2008, I called plaintiff to discuss her overdue discovery.  I left a voicemail message requesting that plaintiff call me to discuss plaintiff's overdue discovery responses.  I further explained that UPS would seek sanctions if no response or contact was forthcoming.  Plaintiff did not return my call.  On August 29, 2008, I called plaintiff again to request a discovery conference.  Someone answered plaintiff's phone and then hung up on me.  I called back and left a voicemail message requesting an immediate conference.  Plaintiff did not return

DECLARATION IN SUPPORT OF DEFENDANT
UNITED PARCEL SERVICE, INC.'S MOTION
TO DISMISS (NO. C07-05453 RBL) – 2
00895-1076/LEGAL15103677.1

**Perkins Coie** LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

my call.  On August 29, 2008, I sent a letter to plaintiff requesting an immediate discovery conference.  Plaintiff did not respond to my letter.  On September 3, 2008, I sent a fourth letter to plaintiff requesting a Rule 37 conference.  Plaintiff did not respond.  The Court granted UPS's motion to compel on October 6, 2008.

7.      UPS noted plaintiff's deposition for September 16, 2008.  At 8:00 a.m., on the morning of her deposition, plaintiff called a receptionist at Perkins Coie claiming that she could not make the deposition because she was "having a heart attack."  Before the receptionist could transfer the call to me or Mr. Reynvaan, plaintiff stated that she could not talk any longer "because she needed to get back on oxygen."  At that time, we were not aware that on September 8, 2008, plaintiff had moved for an unlimited extension of time to find new counsel and had asked the Court postpone her September 16 deposition.  We only received notification of the motion through the Court's electronic filing notification system on September 17, 2008.  On September 16, 2008, we rescheduled plaintiff's deposition for Friday, September 19, 2008.  I sent plaintiff a letter and left her a voicemail message requesting that she call us if she could not make the scheduled deposition.  The next day, plaintiff called me and stated that she would not be attending the deposition on Friday.  She did not mention any medical issues or sound as if she was in distress.  When I asked why, she stated only "I can't miss any more work."  When I asked about her future availability, she stated "I don't know when I'll be available."

8.      On October 7, 2008, I sent a letter to plaintiff by regular and certified mail providing her with a copy of the Court's October 6, 2008 Order Granting Defendant's Motion to Compel and further warned plaintiff that she may be subject to sanctions if she did not comply with the Court's Order.  A true and correct copy of the October 7, 2008 letter is attached hereto as Exhibit C.

9.      On October 31, 2008, I called plaintiff regarding her failure to comply with the Court's Order compelling discovery.  Plaintiff told me that she would provide discovery "when I get the time," cut me off by saying "Have a God blessed day," and then hung up the phone.  I

DECLARATION IN SUPPORT OF DEFENDANT
UNITED PARCEL SERVICE, INC.'S MOTION
TO DISMISS (NO. C07-05453 RBL) – 3
00895-1076/LEGAL15103677.1

sent another letter to plaintiff by regular and certified mail requesting that she comply with the Court's Order by November 7.  Attached hereto as Exhibit D is a true and correct copy of the October 31, 2008 letter.  Since her attorneys' withdrawal, plaintiff has not provided a single answer or document in response to UPS's written discovery requests, and therefore has not complied with the Court's October 6 Order.

10.     Although UPS had still not received plaintiff's complete discovery responses, on December 10, 2008, UPS re-noted plaintiff's videotaped deposition for December 18, 2008.  We sent plaintiff notice of her deposition by regular and certified mail.  A copy of the notice of rescheduled videotaped deposition is attached hereto as Exhibit E.  On December 18, plaintiff again failed to appear at Perkins Coie's office for her deposition.  She did not contact our office either to inform counsel that she would not appear or to explain her failure to appear.  To this date, plaintiff has not bothered to contact our office to explain her absence on December 18 or to try to reschedule her deposition.

11.     UPS has incurred attorneys' fees preparing for the September 16, September 19 and December 18 depositions of plaintiff, as well as cancellation fees for the videographer and court reporter on each of these dates.  Additional attorneys' fees will be incurred to prepare for plaintiff's deposition again.  Most of these expenses would not have been necessary if plaintiff had cooperated in the discovery process, complied with this Court's Order compelling discovery, or communicated with UPS in a timely manner that she would not attend her depositions.

I declare under penalty of perjury under the laws of the State of Washington and the United States that the foregoing is true and correct.

Signed at Seattle, Washington, this 31 day of December, 2008.

Laura M. Solis

DECLARATION IN SUPPORT OF DEFENDANT
UNITED PARCEL SERVICE, INC.'S MOTION
TO DISMISS (NO. C07-05453 RBL) – 4
00895-1076/LEGAL15103677.1

Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that they served a copy of the foregoing

DECLARATION OF LAURA M. SOLIS IN SUPPORT OF DEFENDANT UNITED PARCEL

SERVICE, INC.'S MOTION TO DISMISS to the following via U.S. Mail, postage prepaid,

before the hour of 5:00 pm, on December 31, 2008:

**BY CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**AND FIRST CLASS MAIL**

Ms. Marlene Elliott
30930 - 16th Place S.W., #C
Federal Way, WA 98023
*Attorneys for Plaintiff*


DATED:  December 31, 2008

s/ Michael T. Reynvaan, WSBA No. 12943
MReynvaan@perkinscoie.com
Laura M. Solis, WSBA No. 36005
LSolis@perkinscoie.com
**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Telephone:  206.359.8000
Facsimile:  206.359.9000

Attorneys for Defendant
UNITED PARCEL SERVICE, INC.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

Page 1

| | |
|---|---|
| In the Matter of the | ) |
| Arbitration between | ) |
| | ) |
| United Parcel Service | ) |
| Service, | )   FMCS No. 070604-57258-8 |
| | ) |
| Company, | ) |
| | ) |
| and | ) |
| | ) |
| Marlene Elliott, Teamsters | ) |
| Local Union #174 | ) |
| | ) |
| Union, | ) |

TRANSCRIPT OF PROCEEDINGS

October 2, 2007
1201 Third Avenue, Suite 4800
Seattle, Washington

REPORTED BY:

JOHANNA CHAPIN
CCR NO. 334
JOB NO. 662405

**Exhibit A**

**Declaration of**
**L. Solis -6**

```
                                                                    Page 2
 1                          A-P-P-E-A-R-A-N-C-E-S

 2

     Arbitrator:            DAVID GABA
 3                          Compass Law Group
                            1200 Fifth Avenue, Suite 1900
 4                          Seattle, Washington 98101
                            (206) 728-1110
 5

 6   For the Union:

 7                          DAVID W. BALLEW
                            Reid, Pedersen, McCarthy & Ballew, LLP
 8                          101 Elliott Avenue West, Suite 550
                            Seattle, Washington 98119
 9                          (206) 285-3610
                            David@rpmb.com
10

11

     For the Employer:
12

                            MICHAEL T. REYNVAAN
13                          Perkins Coie, LLP
                            1201 Third Avenue, Suite 4800
14                          Seattle, Washington 98101
                            (206) 359-8469
15                          Mreynvaan@perkinscoie.com

16

17                          LAURA M. SOLIS
                            Perkins Coie, LLP
18                          1201 Third Avenue, Suite 4800
                            Seattle, Washington 98101
19                          (206) 359-3207
                            Lsolis@perkinscoie.com
20

21   Also Present:

22                          MARLENE ELLIOTT
                            BILL BYINGTON
23                          MILT CRAFTON
                            SUSAN SANDOVAL
24                          TED BUNSTINE
                            MURRAY BOURQUE
25
```

Page 29

1      Q.    What is it?

2      A.    This is the decision from the five states

3    grievance panel in July of 2006 in which Marlene's

4    grievance regarding the air shuttle job, her claim for that

5    work, was denied.

6      Q.    Okay.  And this is -- you testified previously

7    about this grievance and that resolution, correct?

8      A.    Yes.

9          MR. REYNVAAN:  Okay.  Move for the admission of 4.

10         ARBITRATOR GABA:  Any objection?

11         MR. BALLEW:  No.

12         ARBITRATOR GABA:  Employer 4 is admitted.

13              (Employer Exhibit 4 is admitted.)

14     Q.    (By Mr. Reynvaan)  Who ultimately made the

15   decision to discharge Ms. Elliott?

16     A.    That would be me.

17     Q.    Okay.  And why did you decide discharge was

18   appropriate?

19     A.    Because, based on the evidence that I had in front

20   of me, it was apparent that Marlene had indeed suggested to

21   the doctor that there was a deal and that the only way the

22   deal would work is that if she were to receive a full

23   release.

24     Q.    And did she, in fact, receive a full release?

25     A.    Based on -- I mean, you're asking me.  I look

Arbitration 10/2/07

Page 30

1    at -- she received a notice of full release, yes, that's

2    correct.

3        Q.    Okay.  That was --

4        A.    Yes.

5        Q.    Okay.  What is UPS's policy on honesty?

6        A.    Well, it's a core value at UPS.  It's found within

7    our policy book and it was -- and most policies were

8    largely established by our founder, Jim Casey.  It's a core

9    value, and we do have a strict policy on honesty and

10   integrity.

11       Q.    And do employees typically sign an honesty policy?

12       A.    Yes.

13             MR. REYNVAAN:  Okay.  I'd like this marked as

14   Company 5.

15                 (Employer Exhibit 5 was marked.)

16             ARBITRATOR GABA:  So marked.

17       Q.    (By Mr. Reynvaan)  Do you recognize -- do you

18   recognize this document?

19       A.    Yes, I do.

20       Q.    Okay.  Did I give you the wrong number?

21       A.    Yes.

22       Q.    Okay.  What is that document?

23       A.    This is a document -- it's titled Honesty in

24   Employment, and it establishes the policy book section on

25   honesty and integrity, and it also speaks to the

Page 31

1    consequences of dishonesty.

2         Q.    Does it appear to be signed by an employee?

3         A.    Yes, it is.

4         Q.    And who does it appear to be signed by?

5         A.    Marlene Elliott.

6         Q.    Is the company's philosophy and policy about --

7    excuse me.

8              MR. REYNVAAN:  I move for the admission of

9    Company 5.

10             ARBITRATOR GABA:  Any objection?

11             MR. BALLEW:  No.

12             ARBITRATOR GABA:  Admitted.

13                  (Employer Exhibit 5 was admitted.)

14        Q.    (By Mr. Reynvaan)  Is that philosophy regarding

15   honesty and truthfulness in the workplace also incorporated

16   in the Collective Bargaining Agreement?

17        A.    Yes, it is.

18        Q.    How so?

19        A.    One of the cardinal infractions listed in the

20   Western Supplement, Article 28, Section 2, is proven

21   dishonesty, and that cardinal infraction is such that there

22   is no need for a prior letter of warning before a

23   termination action would be taken in cases of proven

24   dishonesty.

25        Q.    This has already been stipulated.  It's Joint 1.

Page 32

1   But just for purposes of clarification, could you point out

2   for the arbitrator where this section is in the Collective

3   Bargaining Agreement?

4       A.   Yes.  In the first column, the third paragraph, it

5   lists the cardinal infractions, and proven dishonesty is

6   Subsection 2(a)(1).

7       Q.   And what is the significance of something being a

8   cardinal infraction?

9       A.   Our Collective Bargaining Unit Agreement requires

10  that there at least be a prior letter of warning before you

11  advance to a more severe discipline of suspension or

12  discharge.  Furthermore, the National Master Agreement

13  requires that there is the assumption of innocent until

14  proven guilty, as it is referred to, and the employee would

15  remain on the job until the grievance machinery is

16  exhausted.

17          In these cardinal infractions, the

18  innocent-until-proven-guilty, remain-on-the-job requirement

19  does not remain, and nor is there the need for a warning

20  letter being in effect.

21      Q.   So are these considered -- is it fair to say these

22  are considered the most significant infractions at UPS?

23      A.   Absolutely.

24      Q.   And is the company's prohibition of dishonesty

25  applied in the discipline procedure for employees

Page 33

1   represented by Teamsters Local 174?

2        A.   Yes, it is.

3        Q.   Are you aware of other discharges based on

4   dishonesty that have taken place in the Washington

5   district?

6        A.   Yes, I am.

7        Q.   Which cases are those?

8        A.   Well, there have been a number of proven

9   dishonesty cases, unfortunately.   I only recall two,

10  though, that actually were deadlocked to arbitration.   The

11  others were either sustained or mitigated in some way.

12       Q.   Do you recall the names of those cases?

13       A.   Yes.   The -- when I first got to the district,

14  there was an employee out of our Puyallup building, her

15  name was Michelle Baker, and that case advanced to

16  arbitration where the claim of the union was denied and the

17  discharge was upheld.

18       Q.   Do you recall any other cases in the Washington

19  district?

20       A.   Yes.   Out of our Everett facility, Local 38, an

21  employee by the name of Justin Polson.

22       Q.   And what was the nature of dishonesty in that

23  case?

24       A.   In the Polson case, Juston was dishonest during an

25  investigatory interview.   They were very serious

Page 34

1    allegations, and he misrepresented himself during the

2    investigatory interview and was terminated under proven

3    dishonesty for his deception during the interview.

4         Q.   Did the arbitrator sustain that discharge?

5         A.   Yes, the arbitrator did.

6         Q.   With regard to the discharge of Ms. Elliott, what

7    were the key factors leading to your decision that

8    discharge was appropriate?

9         A.   The key factors obviously were that I -- in

10   viewing the chart notes the doctor prepared and having to

11   accept those as his record of that meeting, it was obvious

12   to me that her medical condition had not changed, that she

13   had proposed to him that there was a deal and, for her to

14   work out this deal and get into a lighter duty job, which

15   she had attempted to do previously, that she would need a

16   full release.

17         I knew that there was no deal in place, and I

18   considered that very serious, that an employee would

19   attempt to return to work without being medically cleared,

20   per se, but, instead, on the basis of a deal.

21        Q.   And would -- in your experience, would the company

22   make any deal that would allow an injured employee to

23   return to work?

24         MR. BALLEW:  Well, we already objected to that

25   question, but...

Arbitration 10/2/07

1          ARBITRATOR GABA:  How long do you guys want?

2          MR. REYNVAAN:  It's up to you guys.  An hour?

3          MR. BALLEW:  Okay.

4          MR. REYNVAAN:  Is that all right?

5          MR. BALLEW:  Yeah.

6          ARBITRATOR GABA:  We'll see you guys back here at

7     one o'clock.

8                    (Lunch recess was taken from

9                     11:57 a.m. to 1:00 p.m.)

10                        * * *

11

12        MR. REYNVAAN:  The company calls Milt Crafton.

13

14                    MILT CRAFTON,

15     having been first duly sworn, was examined and testified

16                    as follows:

17

18           D-I-R-E-C-T  E-X-A-M-I-N-A-T-I-O-N

19     BY MR. REYNVAAN:

20     Q.   Mr. Crafton, would you please state and spell your

21     name for the record.

22     A.   Milt Crafton, M-i-l-t, C-r-a-f-t-o-n.

23     Q.   And would you briefly outline your work experience

24     at UPS.

25     A.   Well, I started with UPS in Christmas season of

Page 104

1    1981, package car driver for just about six years, was

2    promoted into management after that, held various positions

3    in operations of center, manager positions in hub,

4    industrial engineering, a little bit of HR, until my most

5    current position in risk management.

6         Q.    And in your current position, what are your

7    responsibilities?

8         A.    I'm responsible for the Washington district

9    workers' comp claims.  I oversee the management of those

10   cases to our third-party administrator.  I direct in daily

11   dealing with our third-party administrator, Gallagher

12   Bassett.  As a self-insured company, they handle our

13   claims.  I work with the Department of Labor, with our

14   attorneys, and also with occasionally the vendors and the

15   doctors associated with the cases.

16        Q.    Do you have any responsibility for tracking

17   individual cases?

18        A.    Yes.  I track all workers' comp cases.

19        Q.    Would you just give a quick overview of UPS'

20   workers' compensation system, just basically the -- how

21   that system works, very briefly?

22        A.    Well, if someone is injured and they have a claim,

23   the goal is to get that person the best medical treatment

24   and care and get them up to a situation where they're MMI,

25   which is maximum medical improvement.  At that point it may

Page 109

1      Q.    (By Mr. Reynvaan)  And did she keep that

2  appointment?

3      A.    She didn't go to that appointment.  She came in on

4  March 2nd, on an unscheduled appointment.

5      Q.    And who did she meet with at that time?

6      A.    She saw Dr. Deshpande.

7      Q.    Okay.  At that point in time, meaning on the 26th

8  when Ms. Sandoval called you, did you do anything else?

9      A.    Well, I was concerned that there was a return to

10  work note releasing Marlene to full duty with no

11  restrictions, because it was my understanding that her

12  medical condition was not in place for her to return back

13  to work.  So I called Gallagher Bassett, and I talked to

14  Thomas Pak, and I asked -- he was the claims examiner.  I

15  asked him to contact Dr. Arntz' office and see if we could

16  get copies of the chart notes and the return to work note.

17          ARBITRATOR GABA:  I'm going to slow you down.

18  Gallagher Bassett, you talked to Thomas -- give me that

19  last name.

20          THE WITNESS:  Pak.

21          ARBITRATOR GABA:  Spell it for me.

22          THE WITNESS:  P-a-k.

23          ARBITRATOR GABA:  Thank you.  Sorry, Counsel.

24          MR. REYNVAAN:  Oh, that's fine.

25      Q.    (By Mr. Reynvaan)  Was that your typical practice

Page 138

1    questions.

2           MR. REYNVAAN:  Oh, I'm sorry.

3

4           R-E-D-I-R-E-C-T  E-X-A-M-I-N-A-T-I-O-N

5    BY MR. REYNVAAN:

6      Q.    Mr. Crafton, you testified about Ms. Elliott

7    returning to work during the time frame 1/19/2004, date of

8    her injury, and the date of discharge on 3/15/07, correct?

9      A.    Yes.

10     Q.    And I believe you testified she was reinjured

11   during that time frame?

12     A.    Correct.

13     Q.    Do you know how many days -- total days of time

14   loss she received during that time frame?

15     A.    The entire time frame?

16     Q.    Yes, between injury and the date of discharge.

17     A.    It was just over 950 days.

18     Q.    Would you please refer to -- I just want to ask

19   you a question about Company No. 6.  That's the Return to

20   Work Authorization, March 6, '07?

21     A.    Yes.

22     Q.    I thought you testified on direct examination that

23   the only document you received back from Dr. Deshpande was

24   a car wash job description.  But didn't you also receive

25   this?

Arbitration 10/2/07

Page 144

1    Q.    And is that part of your normal process?

2    A.    Yes.

3    Q.    And that was done in this case?

4    A.    Yes, it was.

5    Q.    And following Dr. Bays' receipt of the PCE by

6    Dr. Becker, what did --

7    A.    He amended his opinion on Ms. Elliott's return to

8    work capabilities.

9    Q.    And is that what's represented in Company 10?

10   A.    That is what's represented by this document.

11         MR. REYNVAAN:   Okay.   I move for the admission of

12   Company 10.

13         ARBITRATOR GABA:   Any objection?

14         MR. BALLEW:   The same, its relevance.

15         ARBITRATOR GABA:   Overruled.

16         (Employer Exhibit 10 was admitted.)

17   Q.    (By Mr. Reynvaan)   What was -- Mr. Crafton, what

18   was the final resolution of Ms. Elliott's thumb injury

19   claim?

20   A.    By preponderance of medical -- objective medical

21   evidence, she was found fixed and stable with a permanent

22   and partial disability, given an impairment rating and

23   ordered an impairment payment, and the claim was closed on

24   July 2, 2007.

25   Q.    Is the claim basically over, concluded?

Page 155

1      A.    Supervisor.

2      Q.    And how long have you had that position?

3      A.    One month.

4      Q.    And, now, can you give me a brief history of your

5   employment at UPS.

6      A.    I started in 1985 as a person who was a package

7   car preloader.  I was a part-time supervisor.  I drove a

8   package car for four years.  I had numerous operations

9   assignments throughout our district, and I was in the

10  industrial engineering department.  I was a manager in

11  Tumwater, Puyallup, and I am now in my current assignment

12  in Tacoma.

13     Q.    And as center manager for the Puyallup center, can

14  you tell me what your responsibilities were?

15     A.    Basically just overseeing the operations of the

16  drivers and part-time local sorters for the entire

17  operation of Puyallup.

18     Q.    While you were at the Puyallup center, did you

19  know Marlene Elliott?

20     A.    Very little.  She was gone most of the time that I

21  was manager there.

22     Q.    And why was she gone most of the time?

23     A.    She was off on comp, although she did return

24  enough that we did have contact with each other.

25     Q.    Okay.  And what was her job at that time?

Arbitration 10/2/07

Page 156

1      A.    It was Article 22.3, unloading the package cars at

2   night and then washing them.

3      Q.    Okay.  On or about February 26, 2007, what did you

4   understand Ms. Elliott's work status to be?

5      A.    She was still off on comp, and, as far as I knew,

6   we were still making contact with her once a week, and that

7   was with my full-time supervisor, Dave Breitenbach.

8      Q.    Okay.  And did she report to work at the Puyallup

9   center sometime on or around February 26, 2007?

10     A.    Yeah.  That was on a Monday.  And she came in,

11  clocked in, and then I had no idea she was there until a

12  supervisor came up to me and said, Hey, Marlene is here to

13  work.  And I asked her to come into my office.  She said

14  that she wasn't going to talk to me until her start time,

15  and then after start time I brought her into the office.

16  Should I go on?

17     Q.    Okay.  No, that's okay.

18           What is the company's policy when an employee

19  returns from workers' comp leave?

20     A.    Normally I would know about it ahead of time.  The

21  employee would call, let me know that they were released to

22  work.  And at that point I usually -- I would call either

23  Milt or Mike Lucke in our safety department to confirm that

24  that person is ready to return to work, and then on the

25  first day they would go through safety training, return to

Esquire Depositions
206-624-9099

1    the airport to pick up packages from Alaska Airlines, bring

2    them back to the hub, BFI, Boeing Airfield, and then they

3    would sort them out as to who would be delivering them

4    where, and you would deliver the packages, and you would

5    report back.

6        Q.    And was that full time?

7        A.    That was part time.

8        Q.    Part time.  Okay.  How long did you do that

9    part-time job?

10       A.    Roughly about five years.

11       Q.    Okay.  And you started that in 2001?

12       A.    No.  I had started that -- driving in, I'd say,

13   '97, '98.

14       Q.    Okay.  We've heard about a combination job, a 22.3

15   job?

16       A.    Yeah, Article 22 job.

17       Q.    All right.  Did you have one of those jobs?

18       A.    Yes, I was offered an Article 22 job.

19       Q.    And is that when you went full time?

20       A.    Yes.

21       Q.    When was that?

22       A.    I would say 2001, I think.

23       Q.    Okay.  And the 22.3, it's a combined two part-time

24   jobs to make a full-time position?

25       A.    Yes.

Page 182

1      Q.    And what were your two combined part-time jobs?

2      A.    When I first went to the building, I was an

3    unloader of trailers.   Those are the large trailers that

4    you see the trucks driving around with the tractor

5    trailers.   They back them up to a dock, open the door, you

6    unload the contents, make sure their labels are faced up so

7    they can go through the system, and continue to unload

8    until there's nothing else to unload.

9      Q.    So is that half of your combo job?

10     A.    Yes.

11     Q.    What was the other half?

12     A.    The other half was car wash.

13     Q.    Okay.   So that was your first combo job as of

14   2001.

15     A.    Yes.

16     Q.    Did you ever do any other combo job?

17     A.    Yes.   I ran the air shuttle from the Pacific

18   Building up to BFI, Boeing Airfield.

19     Q.    And was that half of a full-time job?

20     A.    Yes.

21     Q.    What was the other half?

22     A.    Basically, it wasn't even half of a full-time job.

23   You take the air shuttle up.   I was due back on the

24   property at 7:00, which is usually about their break time,

25   no later than 7:15.   When I'm done, I'm supposed to report

Page 183

1    to Dave Breitenbach to see if there's any work to be done

2    in Metro, which is where the trucks, the small trucks -- I

3    don't mean small, but some of the -- all of the brown

4    trucks are backed up and they're unloaded, to see if they

5    need any help, making sure that the lines, which are -- 1

6    through 4 how they're numbered, 100, 200, 300, 400 --

7    and you make sure all of the trucks are empty.  On Fridays

8    you make sure all the packages which are sending-ins are

9    taken off and stuck down below.

10       Q.    And when you mentioned 7 o'clock, is that morning

11   or evening?

12       A.    Okay.  Evening, it would be 1900 hours.

13       Q.    Okay.  So was that air shuttle work, was that

14   after you'd already started as the trailer unload/car wash?

15       A.    Yes.

16       Q.    And so when did that take place?

17       A.    Roughly in a year.  I don't recall the year, Dave.

18   It came up with me with Marty, and another union person

19   asked me did I want to do that air shuttle run because

20   Marty, who was doing it, didn't want to do it anymore.

21       Q.    Marty was a coworker?

22       A.    Marty is a coworker, another combination worker.

23       Q.    Okay.  How long did you do the air shuttle work

24   for?

25       A.    I'd say over a year and a half.  I'm not really

Page 184

1  sure.

2      Q.    Let me get us to 2004 for a sec.  Did you suffer

3  an on-the-job injury to your thumb that year?

4      A.    Yes, I did, my right thumb.

5      Q.    What position were you in?

6      A.    I was working -- I just came back from air

7  shuttle.  I was told to go to the front to help unload a

8  trailer.  I walked into the trailer, started unloading, and

9  the load shifted, and the boxes fell on me.

10     Q.    On your thumb?

11     A.    On my -- yeah, well, my whole body but the

12  majority of it on my thumb.

13     Q.    And then what happened to your thumb?

14     A.    It swelled up.  I reported to the supervisor that

15  was standing there and another employee that my thumb was

16  hurting.  The supervisor stated there was nothing wrong

17  with it, it's okay, just get back to work.  I replied and

18  requested, Can I have some ice?  At that time they told me

19  I had to fill out an L & I claim.  I filled out the L & I

20  claim with Sheila, and I was taken --

21     Q.    Who's Sheila?

22     A.    Sheila was the safety manager.

23     Q.    Okay.

24     A.    She filled out with you all these UPS L & I

25  claims, so if you get injured, if you get a paper cut, you

Page 260

1    **you directly to get this?**

2       **A.    Correct.**

3          MR. REYNVAAN:  Okay.  Thank you.

4          MR. BALLEW:  Nothing further.

5          ARBITRATOR GABA:  Ma'am, thank you very much.

6          THE WITNESS:  Thank you.

7          ARBITRATOR GABA:  Mr. Ballew, your next witness.

8          MR. BALLEW:  Can we take a short break?

9          ARBITRATOR GABA:  Absolutely, sir.

10                  (A brief break was taken.)

11         ARBITRATOR GABA:  Okay.  Back on the record.

12       Mr. Ballew, any further witnesses?

13         MR. BALLEW:  Yeah, Ted Bunstine.

14

15                        *  *  *

16

17                     TED BUNSTINE,

18    having been first duly sworn, was examined and testified

19                      as follows:

20

21             D-I-R-E-C-T   E-X-A-M-I-N-A-T-I-O-N

22    BY MR. BALLEW:

23       **Q.    Ted, could you spell your name for the court**

24    **reporter.**

25       **A.    Ted Bunstine, B-u-n-s-t-i-n-e.**

Page 261

1    Q.   And are you employed by Local 174?

2    A.   Yes, I am.

3    Q.   In what capacity?

4    A.   I am a business agent and elected president.

5    Q.   How long have you held those positions.

6    A.   On and off since 1995.

7    Q.   And when you were not filling those positions,

8    were you employed at UPS?

9    A.   Yes, I was.

10   Q.   In what capacity?

11   A.   I've been employed at UPS since 1979 for ten years

12   as a package car driver and from 1989 on as a feeder

13   driver.

14   Q.   Okay.  As your duties as a business agent, were

15   you involved at all in this grievance over termination of

16   Marlene Elliott?

17   A.   Yes, I was.

18   Q.   Did you in that capacity attend a center-level

19   hearing?

20   A.   Yes, I did.

21   Q.   What is in the process?  What's a center-level

22   hearing?  Is that a first step?  How can you explain that

23   for us?

24   A.   The center-level hearing would be the first step

25   in the grievance procedure after a grievance is filed.  And

1    involved in this case, did Dr. Arntz ever recant his

2    statement -- the statement in the chart notes that

3    Ms. Elliott told him that there was a deal to get her back

4    to work?

5         A.   Did he recant his statement?

6         Q.   Yeah, did he ever recant it?  Did he ever say, Oh,

7    that is not what she told me?

8         A.   I'm not sure if I know what you're referring to.

9         Q.   Okay.  Well, take a look at Company 3.  It's a

10   one-page document.

11        A.   Okay.

12        Q.   2/21/07.

13        A.   Okay.

14        Q.   And under History it says -- in the notes it says,

15   "Apparently she has worked out a 'deal'," in quotes, "where

16   if she goes back to work, her union will ultimately help

17   her get into a lighter job."

18             First, were you aware of any such deal?

19        A.   No.

20        Q.   Was any such deal ever made?

21        A.   Not that I'm aware of.

22        Q.   Okay.  My question is, in this case, including

23   getting additional chart notes from Dr. Arntz, did he ever

24   state that he made a mistake in writing down this, that she

25   had worked out a deal?

Arbitration 10/2/07

Page 298

1              C E R T I F I C A T E

2

3   STATE OF WASHINGTON          )

4   COUNTY OF KING               )

5          I, the undersigned Certified Court Reporter and an

6   officer of the Court under my commission as a Notary Public

7   for the State of Washington, hereby certify that the

8   foregoing arbitration was taken before me on October 2,

9   2007, and transcribed under my direction;

10         That the witnesses were duly sworn to testify

11  truthfully; that the transcript of the arbitration is a

12  full, true, and correct transcript to the best of my

13  ability; that I am neither attorney for, nor a relative or

14  employee of, any of the parties to the action or any

15  attorney or counsel employed by the parties hereto, nor

16  financially interested in its outcome.

17         IN WITNESS WHEREOF, I have hereunto set my hand and

18  seal this 15th day of October, 2007.

19

20

21

22

23

24                                      Johanna Chapin, #334, Notary Public
                                        in and for the State of Washington,
25                                      residing at Seattle, Washington.



**Valley Orthopedic Associates**
4011 Talbot Road South, #300, Renton, WA 98055
Phone 425-656-5060 • Fax 425-656-5047

**ELLIOTT, MARLENE A.**

SI:   Gallagher Bassett Services
DOI:  01/19/04 - Right Thumb
EMP:  United Parcel Services
CLM:  W934004

**February 21, 2007**          FOLLOW-UP

**DIAGNOSIS:**
1. Status post right thumb MP joint arthrodesis; 6/17/2005.
2. Status post hardware removal, extensor tenolysis and capsulotomy, right thumb IP joint; 1/17/2006.
3. Residual problems of diminished right thumb IP joint range of motion and right thumb function.

**HISTORY:** Marlene returns for followup. She continues to be troubled by problems of chronic right thumb pain and stiffness. She has been in contact with her union. Apparently she has worked out a "deal", where if she goes back to work her union will ultimately help her get into a lighter job. She informs me that before they can do this however I will need to clear her to return to work without restriction.

I today reviewed job analyses for a "courier" position as well as a "driver" position. The patient would like to be cleared for both of these positions and we will therefore do so today.

**PHYSICAL EXAMINATION:   Right hand and wrist examination:**  The patient's right thumb symptoms and findings on examination are found to be without significant change from her visit here on 1/4/2007. Her surgical wounds are well healed. Her right thumb MP joint fusion appears to be quite solid and to be in good overall position. Her right thumb IP joint range of motion ranges through an arc of about 0°-45° of flexion and is stable. Her right thumb basilar joint is mobile and stable. Her distal sensory, motor and vascular function is normal with the exception of an area of sensory loss over the dorsum of her thumb MP joint and proximal phalanx. Her palmar sensation is within normal limits.

**IMPRESSION:**
1. Solid right thumb MP joint.
2. Moderate stiffness, right thumb IP joint.
3. Problem of diminished sensation and chronic discomfort, right thumb.

**DISCUSSION:** As noted above, we will today clear the patient to return to the job positions outlined above. We will clear her to return to full duty without restriction as of 2/26/2007. I renewed a prescription for Naprosyn, 500 mg po B.I.D. The patient will discontinue this if she has any GI or other side effects from its use. Her condition is not yet fixed and stable. She will follow up with Greg Parker, PA-C in approximately four weeks. I will see her back in follow up in eight weeks. We will see her back before this if any new problems or concerns arise.

**Craig T. Arntz, M.D.**
*Dictated but not reviewed.*

CTA/clc

cc: Gallagher Bassett Services



**Exhibit B**

**Declaration of
L. Solis -29**

Page 1 of 1

**MED 0591**
Elliott v. UPS



**Perkins Coie**

Laura M. Solis
PHONE (206) 359-3207
FAX   (206) 359-4207
EMAIL  LSolis@perkinscoie.com

1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
PHONE 206.359.8000
FAX 206.359.9000
www.perkinscoie.com

October 7, 2008

**CERTIFIED MAIL, RETURN RECEIPT REQUESTED
AND REGULAR MAIL**

Ms. Marlene Elliott
30930 - 16th Place S.W., #C
Federal Way, WA 98023

Re:     **Elliott v. United Parcel Service, Inc.**

Dear Ms. Elliott:

I am enclosing the Court's order of October 6, 2008 compelling you to respond to United Parcel Service, Inc.'s First Request for Production of Documents and Second Requests for Production of Documents pursuant to Fed. R. Civ. P. 37(a). We are enclosing another copy of these discovery requests for your convenience.

Please provide your complete responses as soon as possible.

Very truly yours,

*Laura Solis*

Laura M. Solis

LMS:sh
Enclosures

cc:     Michael T. Reynvaan

**Declaration of
L. Solis -30**

**Exhibit C**

00895-1076/LEGAL14742014.1

ANCHORAGE · BEIJING · BELLEVUE · BOISE · CHICAGO · DENVER · LOS ANGELES · MENLO PARK
OLYMPIA · PHOENIX · PORTLAND · SAN FRANCISCO · SEATTLE · SHANGHAI · WASHINGTON, D.C.

Perkins Coie LLP and Affiliates



Laura M. Solis
PHONE  (206) 359-3207
FAX    (206) 359-4207
EMAIL  LSolis@perkinscoie.com

1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
PHONE: 206.359.8000
FAX: 206.359.9000
www.perkinscoie.com

October 31, 2008

**CERTIFIED MAIL: RETURN RECEIPT REQUESTED
AND FIRST CLASS MAIL**

Ms. Marlene Elliott
30930 - 16th Place S.W., #C
Federal Way, WA 98023

Re:   **Elliott v. UPS**

Dear Ms. Elliott:

This letter will follow up on our telephone conference this morning regarding your failure to respond to UPS's First Requests for Answers to Interrogatories and For Production of Documents and Second Requests for Production of Documents. As you know, on October 6, 2008, the Court ordered you to provide complete answers and responses to these discovery requests. On October 7, 2008, we sent you a letter containing a copy of the Court's order and requested your immediate compliance with the Order.

I called you this morning to let you know that we need to have your complete answers and responses as soon as possible. You told me that you would respond "when I get the time," but refused to state a date or even an estimated time frame. Unfortunately, you cut me off and hung up before we could finish the conversation.

We request that you comply with the Court's order by November 7, 2008. Your refusal to communicate with us regarding your discovery obligations is inappropriate, and violates a direct Court order. If we do not receive your complete answers and responses by November 7, we will be forced to renew our request to the Court for sanctions.

**Declaration of
L. Solis -31**                    **Exhibit D**

00895-1076/LEGAL14865504.1

ANCHORAGE · BEIJING · BELLEVUE · BOISE · CHICAGO · DENVER · LOS ANGELES · MENLO PARK
OLYMPIA · PHOENIX · PORTLAND · SAN FRANCISCO · SEATTLE · SHANGHAI · WASHINGTON, D.C.

Perkins Coie LLP and Affiliates

Ms. Marlene Elliott
October 31, 2008
Page 2


Also enclosed is a copy of Defendant's Requests for Admissions to Plaintiff.  Your responses to Defendant's Requests for Admissions will be due within 30 days.  Your failure respond within the required time will result in the questions being deemed admitted.

Very truly yours,

Laura M. Solis

LMS:sh
Enclosure

cc:    Michael T. Reynvaan


**Declaration of
L. Solis -32**

00895-1076/LEGAL14865504.1

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

   Marlene Elliott
   30930 - 16th Pl. SW, #C
   Federal Way, WA 98023

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _D. Goode_    ☐ Agent   ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

B Goode    11-19-8

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:   ☐ No

3. Service Type
   ☑ Certified Mail   ☐ Express Mail
   ☐ Registered       ☐ Return Receipt for Merchandise
   ☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
   (Transfer from service label)    7004 1350 0005 3849 7192

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

**Declaration of
L. Solis -33**

THE HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| MARLENE ELLIOTT, a single individual, | No. C07-05453 RBL |
| Plaintiff, | FIRST AMENDED NOTICE OF RESCHEDULED VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF MARLENE ELLIOTT |
| v. | |
| UNITED PARCEL SERVICE, INC., a foreign corporation, | |
| Defendant. | |

TO:   MARLENE ELLIOTT, Plaintiff

YOU WILL PLEASE TAKE NOTICE that the deposition of the following individual

will be taken upon oral examination at the instance and request of defendant United Parcel

Service, Inc. in the above-entitled action, before a Notary Public, at the offices of Perkins Coie,

LLP, 1201 Third Avenue, Suite 4800, Seattle, WA 98101:

| **Deponent** | **Date and Time** |
|---|---|
| Marlene Elliott | December 18, 2008, 9:30 a.m. |

The testimony will be recorded by stenographic means and videotaped. The oral

examination will be subject to continuance or adjournment from time to time or place to place

**Declaration of**
**L. Solis -34**                    **Exhibit E**

1ST AM. NOTICE OF DEPOSITION UPON
ORAL EXAMINATION OF MARLENE
ELLIOTT (NO. C07-05453) – 1
00895-1076/LEGAL14623629.2

Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

until completed, and will be taken on the ground and for the reason that the witness will give

evidence material to defendant's case.

DATED:  December 10, 2008

PERKINS COIE LLP

By: _____

Michael T. Reynvaan, WSBA No. 12943
MReynvaan@perkinscoie.com
Laura M. Solis, WSBA No. 36005
LSolis@perkinscoie.com
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Telephone:  206.359.8000
Facsimile:  206.359.9000

Attorneys for Defendant
UNITED PARCEL SERVICE, INC.

**Declaration of
L. Solis -35**

NOTICE OF DEPOSITION UPON ORAL
EXAMINATION OF MARLENE ELLIOTT (NO.
C07-05453) – 2

00895-1076/LEGAL14623629.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she served a copy of the foregoing FIRST

AMENDED NOTICE OF RESCHEDULED VIDEOTAPED DEPOSITION UPON ORAL

EXAMINATION OF MARLENE ELLIOTT to the following via U.S. First Class and Certified

Mail, postage prepaid, on December 10, 2008:

Ms. Marlene Elliott
30930 - 16th Place S.W., #C
Federal Way, WA 98023
*Plaintiff*


_____
Steve Herchelrode
Legal Secretary

**Declaration of
L. Solis -36**

00895-1076/LEGAL14623629.2

**Perkins Coie** LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000